UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN FARBER,<br><br>                    Plaintiff,<br><br>       v.<br><br>THE WALT DISNEY COMPANY, BUENA VISTA THEATRICAL GROUP LTD. d/b/a DISNEY THEATRICAL GROUP, JOHN DOES 1-5, and DOE CORPORATIONS 1-5,<br><br>                    Defendants. | Docket No.<br><br>**COMPLAINT** |

Plaintiff JONATHAN FARBER, by and through his attorneys, KOVEL LAW PLLC and KIBLER FOWLER & CAVE LLP, hereby alleges as follows:

**INTRODUCTION**

1.      Plaintiff Jonathan Farber ("Farber") brings this action against his former employer, Defendants The Walt Disney Company and Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group (collectively, "Disney Defendants" or "Disney"), to enforce his rights in response to Disney's retaliatory and unlawful termination of his employment.

2.      In 2020, Farber, who is proudly and openly Jewish, submitted a formal complaint to Disney informing it that its Director of Human Resources, Marie-Pierre Varin ("Varin"), blocked his routine promotion because of her antisemitic views.

3.      In his complaint, Farber provided Disney with indisputable evidence of Varin's antisemitism, including a screenshot of a tweet from Varin's Twitter account that read:

> "*Why does 'Jesus save'? Cuz he's a Jew and loves coupons ;)*"

Varin retweeted this antisemitic statement on July 26, 2014. A true and correct copy of the screenshot included in Farber's complaint to Disney is shown below:

1



4.      After receiving Farber's written complaint, Disney assured Farber that it would investigate the matter. Instead, on information and belief, despite there being indisputable evidence of antisemitism by one of its employees (a senior employee, no less), Disney interviewed only Varin and one other employee. This minimal effort by Disney was made after Farber named several employees who could aid in a serious investigation.

5.      Even based on Disney's cursory investigation, Varin admitted:

"*It's possible I may or may not have done or said these things. I cannot remember.*"

6.      Disney inexplicably ignored Varin's admission—and the hard evidence submitted by Farber—and did nothing more. This shockingly unlawful behavior was carried out at the

direction of the top of the management structure—Disney Theatrical Group's President, Thomas C. Schumacher III, and Senior Vice President of Human Resources for Disney Studios, Carolyn Wilson, both of whom told Disney's internal investigator that they "*had no issues with anything [Varin] said or did.*" Accordingly, Disney's investigator simply ended the investigation into Farber's complaint.[1]

7.      Disney did not even reprimand Varin for her antisemitism. Rather, Varin was *promoted* from her director role at Disney Theatrical Group to her current Vice President role at Disney Animation Studios in Burbank, California. What's more, Disney allowed Varin to continue to oversee the Human Resources department of Disney Theatrical Group, which continued to commit unlawful acts of retaliation and discrimination against Faber over the next three years, culminating in his termination.

8.      For example, Disney allowed Varin to reduce Farber's routine salary increase(s) below the recommendation from Disney's own salary experts. This highly unusual and clearly punitive conduct required a year-long internal salary audit to correct. Disney eventually acknowledged that it had shortchanged Farber by more than $30,000 in salary payments.

9.      Then, on September 5, 2023, after the last Manager who protected Farber in the fallout of his complaint against Varin departed from Disney, Disney terminated Farber under false pretenses. Indeed, in an attempt to justify the retaliatory firing, Disney contrived damaging lies about Farber and his closest colleagues, and repeated those damaging lies to individuals outside

---

[1] Antisemitism is experiencing a dramatic increase in the United States (and worldwide), including in the workplace. *See, e.g.,* https://fortune.com/2023/04/05/adl-antisemitism-rise-across-america-workplace-success-careers-diversity-politics-greenblatt-hess/; *see also* https://finance.yahoo.com/video/adl-calls-companies-more-fight-211305291.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAJSJPLONcgFfqdPbVtwlYE5gFrcE-Br0uSuf4qGPulpjodRol1Mzaq6NwS8xDSu9w9NVDlzFHeEsXLVb8tl5uX3z2u24qdpTD4qu1jv29UBxgmlonQqp0oUnUnwmveKJpB1wd5dBfMx1jGrD-J2fcV4QurrJDte57hw8zM4AlzIT.

of the organization.

10. Disney continues to harm and demean Farber, including by posting Farber's image on a "Do Not Admit" list inside the New York theaters that host Disney musicals, including musicals that Farber himself worked on—pouring years of his time and effort into.

11. Disney committed these intentional and willful acts in violation of Farber's rights guaranteed to him by, among other things, the statutory prohibitions of religion discrimination and retaliation found within the New York City Human Rights Law.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. § 1332 because Plaintiff's claims exceed $75,000, exclusive of interest and costs, and the parties are diverse.

13. Venue is proper under 28 U.S.C. § 1391(b) because the events underlying this action occurred within the Southern District of New York and because the Defendants have a principal place of business in this District.

## THE PARTIES

14. Plaintiff Jonthan Farber is an individual who is, and at all relevant times was, a resident of Fort Lee, New Jersey. Farber was employed by Defendants The Walt Disney Company and Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group, from in or around August 21, 2017, until his unlawful termination on September 5, 2023.

15. Defendant The Walt Disney Company is an American mass media conglomerate organized under the laws of the State of Delaware and headquartered in Burbank, California. Upon information and belief, The Walt Disney Company is the world's second-largest media company.

16. Upon information and belief, Defendant Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group is, and at all relevant times was, a New York subsidiary corporation owned and operated by parent company and Defendant The Walt Disney Company, organized under the laws of the State of New York, and duly-authorized to conduct business in the County, City and State of New York.

17. Buena Vista Theatrical Group Ltd. is a live entertainment production company that operates Broadway theater shows owned by The Walt Disney Company, with its North American headquarters in New York County.

## FACTUAL BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

### *Farber Hired by Disney and Flourishes in Role*

18. In August 2017, Farber began working for Disney as a Labor Relations professional, first as a Labor Relations Coordinator and later as a Labor Relations Manager.

19. In his roles, Farber was responsible for participating in negotiations with labor unions and its members in the theater industry on behalf of Disney. Farber reported to Disney Theatrical Group's Director of Labor Relations.

20. Farber was experienced and fully qualified for his positions at Disney. Among other things, he had a previous role as a General Manager/Company Manager in the theater industry, which included labor relations experience, and a requisite educational background, which includes a Bachelor of Arts degree from George Washington University and a Master of Fine Arts degree in Screenwriting from Chapman University.

21. Farber successfully executed his duties to Disney's satisfaction, as confirmed by his glowing performance reviews. Indeed, during his employment with Disney, Farber received the prestigious "Rising Star" award from the Broadway League (the national trade association for

the Broadway theater industry) and was selected to work three separate roles simultaneously, including his regular position in labor relations and as an Assistant Company Manager on two well-renowned musicals: *The Lion King* and *Aladdin*.

### *Disney Denies Farber a Promotion; Varin's Antisemitism Discovered*

22. Soon after Farber finished his temporary role on *Aladdin*, he was a candidate for a promotion with Disney. This promotion process would go through Disney's Labor Relations as well as Human Resources departments.

23. Farber was excited for this advancement opportunity, and met with all the respective decision-makers, who assured Farber that he would receive the promotion.

24. However, despite the assurances he received from the stakeholders in Labor Relations, and the accolades he received earlier in the year, in January 2020 Farber learned that he was inexplicably not selected for a promotion. Farber was devastated.

25. Shockingly, Farber then learned that he would be in the *first group* of employees selected for furlough when Disney shut down its Broadway operations due to the COVID-19 pandemic.

26. Soon after being denied a promotion and selected for furlough, Farber discovered that Varin played a meaningful role in why he was not selected for a managerial position, and that Varin had retweeted the antisemitic statement noted above on her Twitter account. Based on this and other actions by Varin, it was evident that Varin's antisemitism and Farber's religious identity were primary reasons why Farber was not promoted.

### *Farber Formally Complains to Disney Regarding Varin's Antisemitism*

27. After discovering Varin's antisemitic statement, Farber formally complained to Disney multiple times. In or around early April 2020, Farber complained to his immediate

6

supervisor at Disney, Scott Kardel, and revealed Varin's offensive tweet. Mr. Kardel told Farber that he would not stop Farber from complaining to Disney's Employee Relations department.

28. On April 16, 2020, Farber complained in writing to Pam Wong, Senior Manager of Employee Relations at Disney Studios, who also assisted with Human Resources functions at Disney Theater Group.

29. In his complaint, Farber outlined all the events that led to him being passed over for the promotion, including the antisemitic tweet from Varin.

30. On April 20, 2020, Wong escalated the complaint to Marisa Dye, Senior Manager of Employee Relations at the Disney parent company, Defendant The Walt Disney Company, who said that she would be handling the complaint moving forward. She also informed Farber that she "*would not be able to speak with* [Farber] *until his furlough period is over*."

31. The decision not to immediately move forward with Farber's complaint was unusual. Indeed, Farber knew that other Disney employees had recently been temporarily reinstated from furlough specifically to assist with investigations into alleged violations of the workplace discrimination and retaliation prevention laws.

32. While Farber was on furlough and not permitted to communicate with Disney, Disney promoted Varin out of her Director role in Disney Theater Group in New York to Vice President at Disney Animation Studios in Burbank, California.

33. Farber attempted to speak with Ms. Dye on two separate occasions while he was out on furlough: once in July 2020 and again in September 2020. Each time she said she would not speak with him until the furlough period was over, even though both parties knew at the time that any furlough would not end until at least March 2021.

34. Farber's furlough did not end until June 2021. In other words, Disney did nothing

7

in response to Farber's complaint, under the guise of his furlough, for approximately 13 months.

### *Disney Still Refuses to Investigate Farber's Complaint After Furlough Period*

35. Immediately after returning to Disney from his furlough period, Farber scheduled a follow-up conversation with Ms. Dye, who acknowledged that she received a copy of the antisemitic tweet. Yet she interviewed only Mr. Kardel and Varin and did not speak with any of the other employees who Farber indicated had knowledge of the situation.

36. Despite her admission that she failed to adequately investigate Farber's complaint, Ms. Dye brazenly told Farber that Disney "*did not find any evidence of antisemitism or bias*" against him. She inexplicably did not address the tweet.

37. During their conversation, Ms. Dye disclosed to Farber that during her investigatory conversation with Varin, in response to Ms. Dye's questions regarding Farber's complaint, Varin admitted "*[i]t's possible I may or may not have done or said these things. I cannot remember.*"

38. Ms. Dye also told Farber that the investigation ended because both Tom Schumacher, the President of Disney Theatrical, and Carolyn Wilson, Senior Vice President of Human Resources for Disney Studio, told her that they "*had no issues with anything [Farber complained] Varin said or did.*" In other words, according to Ms. Dye, *two Senior Disney Executives "had no issues" with another Senior Executive expressing antisemitic views.*

39. In effect, Mr. Schumacher and Ms. Wilson ended Disney's investigation despite Varin's admission; condoning Varin's antisemitic behavior and protecting her on behalf of Disney.

40. In this wake of these shocking admissions by Ms. Dye, Farber tried to internally transfer out of his role at Disney Theater.

41. The main decisionmaker for the role Farber desired, Jack Eldon, Vice President of Domestic Touring, did not even interview Farber before selecting another candidate for the position. This too was so shocking and abnormal at Disney that a member of Human Resources preemptively filed a retaliation complaint *on behalf of Farber* when she learned that his application had not been processed for an interview by Eldon.

42. Once again, Ms. Dye intervened and rejected the retaliation complaint filed on Farber's behalf.

### *Disney Withholds Salary Owed to Farber as Further Retaliation*

43. Soon thereafter, Disney's Human Resources department reached out to Farber (nearly a year after he initially applied for a Manager role in Labor Relations) and informed him that he was again a candidate for the same promotion he was supposed to have been given a year earlier. Upon information and belief, Mr. Kardel and Mr. Olson pushed for this promotion over the objection of Varin and her cohorts.

44. When the promotion became effective in September 2021, Farber learned that his salary would increase to just $85,000, which was well below the parity range between same-level Managers at Disney. Consequently, Farber was left with the highly unusual and time-consuming recourse of requesting a salary audit with Human Resources.

45. Several months later, on May 26, 2022, Disney finally acknowledged that Farber's salary should have been roughly $116,000, a shortfall of more than $30,000 that Farber was forced to endure for nearly a year during the audit.

46. When Farber asked why his salary deviated so drastically from the recommendation, the Disney employee who conducted the audit stressed that she did not know any of the details that led to this "*giant*" discrepancy but said "*something was highly fishy about it*

9

*all.*"

47. Mr. Kardel told Farber that he believed Varin had made the decision to lower Farber's salary to punish Farber for his previous complaint about her antisemitic tweet and discrimination against him.

*Disney Terminates Farber Under False Pretenses*

48. When Farber became a Manager, only two decisionmakers, Mr. Kardel and Mr. Olson, openly protected him from the retaliation he endured from Varin and her cohorts at Disney. Mr. Kardel left Disney in early 2023; Mr. Olson left September 1, 2023.

49. On September 5, 2023, the next business day following Mr. Olson's departure, Disney terminated Farber. Farber soon learned that Disney told others, including individuals outside of Disney, that he shared inside information about Disney's ongoing labor negotiations with Mr. Kardel. This complete lie was used by Disney as a pretense to carry out its retaliatory firing of Farber. Because Varin was a Senior Manager and trusted ally to Disney Theatrical Group's President, Thomas Schumacher, Disney's leadership resented Farber for the complaint lodged against Varin. Disney's years of discriminatory and retaliatory behavior targeted against Faber culminated in Faber's termination.

50. But Disney's mistreatment of Farber did not end there. Disney continues to include Farber on its "Do Not Admit" lists for its Broadway shows, including the musicals that Farber himself worked on.

51. As a result of Disney's discriminatory and retaliatory conduct, Farber has suffered the adverse effects of discrimination, the quality of his life has been irreparably damaged and his self-esteem, self-respect, and well-being have been irreversibly harmed. He has been subjected to the humiliating and demeaning type of conduct described herein, all of which will continue to be

a source of humiliation, distress, and financial loss to Farber.

52. Disney acted with willful or wanton negligence, or recklessness, or a conscious disregard of Farber's rights under, among other things, the New York City Human Rights Law. Disney's unlawful actions against Farber were so reckless as to amount to a disregard of Farber's rights.

53. Accordingly, in addition to damages inflicted upon Farber, Disney should be required to pay punitive damages as punishment for its discriminatory and retaliatory conduct in order to deter it and others similarly situated from engaging in such conduct in the future.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DISNEY DEFENDANTS
### NYCHRL: Religion Discrimination

54. Farber repeats and realleges all the allegations in the paragraphs above as if fully stated herein.

55. The acts which constitute and form this cause of action were perpetuated upon Farber while he was in the course of his employment with Disney and while he was protected under the New York City Human Rights Law because of his religion.

56. At all relevant times herein, Farber was fully qualified for his position and performed his duties in that position in a satisfactory fashion and was able to continue doing so.

57. The circumstances surrounding Defendants' conduct towards Farber, including the fact that Varin played an active role in failing to promote Farber in 2019 into 2020, then Disney permitting Varin to continue making decisions that negatively impacted Farber's employment even after knowing she was antisemitic, including lowering Farber's raise punitively in 2022, gives rise to a very real inference that the actual basis for Defendants' actions towards Farber was religion discrimination.

58. The facts contained herein constitute unlawful discrimination against Farber by Disney, based on Farber's religion, in violation of Chapter 1, Title 8 of the Administrative Code of the City of New York, § 8-107(1)(a) (the "New York City Human Rights Law"), which, among other things, states that:

> "It shall be unlawful discriminatory practice…[f]or an employer or an employee or agent thereof, because of the actual or perceived …religion…of any person, to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment."

59. As a proximate result of Disney's conduct, Farber has been adversely affected in his employment, emotional well-being, the quality of his life and in his normal life's pursuits, and Farber believes Disney's conduct, complained of herein, has and will continue to have a negative effect upon him.

60. Here, Disney's conduct towards Farber shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Farber's rights under the New York City Human Rights Law, or that its unlawful actions against Farber were so reckless as to amount to a disregard of Farber's rights, so that in addition to all the damages inflicted upon Farber and in addition to all the measures of relief to which Farber may be properly entitled herein, Disney should additionally be required to pay punitive damages as punishment for its discriminatory conduct and in order to deter Disney and others similarly situated from engaging in such conduct in the future.

61. Farber, therefore, seeks compensatory damages in this cause of action, including, among other things, for loss of earnings and loss of earning capacity and the emotional harm inflicted upon him, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and pre-judgment interest.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DISNEY DEFENDANTS
### NYCHRL: Retaliation

62. Farber repeats and realleges all the allegations in the paragraphs above as if fully stated herein.

63. At all times relevant hereto, Farber and his employment with Disney was protected by the New York City Human Rights Law.

64. Disney retaliated against Farber by lowering his raise, and then permitting false accusations against Farber while terminating him, all of which began days after he returned to work following his protected complaint of religion discrimination that was not properly investigated, if at all.

65. To add insult to injury, Disney still posts Farber's name and image on the "Do Not Admit" list at the venues showing the Disney musicals that Farber himself worked on—pouring years of his time and effort into.

66. Disney's actions constitute unlawful retaliation against Farber in violation of § 8-107(7) of the New York City Human Rights Law, which provides, among other things, that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has … (i) opposed any practice forbidden under this chapter."

67. As a proximate result of Disney's conduct, Farber has been adversely affected in his employment and career, emotional well-being, the quality of his life and in his normal life's pursuits, and Farber believes Defendants' conduct, complained of herein, has and will continue to have a negative effect upon him.

68. Here, Disney's conduct towards Farber shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Farber's rights under the New York City

Human Rights Law, or that its unlawful actions against Farber were so reckless as to amount to a disregard of Farber's rights, so that in addition to all the damages inflicted upon Farber and in addition to all the measures of relief to which Farber may be properly entitled herein, Disney should additionally be required to pay punitive damages as punishment for their discriminatory conduct, in order to deter Disney and others similarly situated from engaging in such conduct in the future.

69. Farber, therefore, seeks compensatory damages in this cause of action, including, among other things, for loss of earnings and loss of earning capacity and for the emotional harm inflicted upon him, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and pre-judgment interest.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Jonathan Farber demands judgment against Defendants Disney Theatrical Group and John/Jane Does 1-5 and Doe Corporations 1-5 as follows:

On the First Cause of Action:

    1. Compensatory damages;

    2. Punitive damages;

    3. Costs, pre-judgment interest and attorney's fees as permitted under the law; and

    4. Any other relief as this Court deems just and proper.

On the Second Cause of Action:

    1. Compensatory damages;

    2. Punitive damages;

3. Costs, pre-judgment interest and attorney's fees as permitted under the law; and

4. Any other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
January 18, 2024

**KOVEL LAW PLLC**

  /s/ Daniel H. Kovel
DANIEL H. KOVEL (DK6676)
14 East 96th Street, Suite #3
New York, New York 10128
P: (646) 397-1729
E: dkovel@kovel-law.com

**KIBLER FOWLER & CAVE LLP**

  /s/ Matthew J. Cave
MATTHEW J. CAVE
11100 Santa Monica Blvd., Suite 360
Los Angeles, California 90025
P: (310) 409-0400
E: mcave@kfc.law
(*pro hac vice forthcoming*)

*Attorneys for Plaintiff*