**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JONATHAN FARBER,

Plaintiff,

v.

THE WALT DISNEY COMPANY, *et al.*,

Defendants.

Case No.: 1:24-cv-00391-AS

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

ORAL ARGUMENT REQUESTED

**McDERMOTT WILL & EMERY LLP**

Kerry Alan Scanlon (admitted *pro hac vice*)
David Beach
500 North Capitol Street, N.W.
Washington, DC 20001
Tel: (202) 756-8696

*Attorneys for Defendants*

Dated: March 18, 2025

# TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

LEGAL STANDARD ..... 6

ARGUMENT ..... 8

I. PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW ..... 8

A. It Was Not Retaliatory To Promote Plaintiff Into A Position For Which He Was Qualified And Not Into One He Was Not ..... 8

i. Plaintiff Lacked Critical Qualifications for the Domestic Touring Operations Position ..... 8

ii. Plaintiff Cannot Establish That the Theatrical Group's Reason Not To Select Him for a Position for Which He Was Not Qualified Was Pretextual or Motivated In Part By Retaliation ..... 12

B. There Is No Evidence That Plaintiff's Increased Salary After His Promotion Was Retaliatory ..... 15

i. Plaintiff's Initial Salary of $85,000 Was In Accordance with Other Theatrical Group Managers and the Live-Entertainment Industry ..... 15

ii. Plaintiff Cannot Establish Pretext Or That Theatrical Group's Salary Decision Was Motivated In Part By Retaliation ..... 17

C. Plaintiff's Termination, Which Occurred More Than Three Years After His Complaint, Could Not Possibly Be Motivated By Retaliation ..... 18

i. Plaintiff Cannot Establish the Causation Element of a Prima Facie Case of Retaliatory Termination ..... 18

ii. Theatrical Group Had Legitimate, Nonretaliatory Reasons for Terminating Plaintiff's Employment ..... 20

iii. There Is No Evidence That Theatrical Group's Legitimate, Nonretaliatory Reasons for Terminating Plaintiff Were Pretextual or Motivated In Part By Retaliation ..... 23

II. PLAINTIFF HAS FAILED TO SHOW THAT THE WALT DISNEY COMPANY HAS "A SINGLE EMPLOYER" RELATIONSHIP WITH THE THEATRICAL GROUP THAT EMPLOYED PLAINTIFF ..... 24

CONCLUSION ........................................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Equinox Holdings, Inc.*,
662 F. Supp. 3d 444 (S.D.N.Y. 2023), *aff'd* (2d Cir. Apr. 25, 2024) ....7, 8

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....6

*Arculeo v. On-Site Sales & Mktg., LLC*,
425 F.3d 193 (2d Cir. 2005)....24

*Bantamoi v. St. Barnabas Hosp.*,
146 A.D.3d 420 (N.Y. App. Div. 2017) ....20

*Benzinger v. Lukoil Pan Americas, LLC*,
447 F. Supp. 3d 99 (S.D.N.Y. 2020)....26

*Brown v. Daikin Am. Inc.*,
756 F.3d 219 (2d Cir. 2014)....24

*Celotex v. Catrett*,
477 U.S. 317 (1986)....6

*Concepcion v. City of New York*,
2016 WL 386099 (S.D.N.Y. Jan. 29, 2016), aff'd, 693 F. App'x 31 (2d Cir. 2017) ....10

*D'Amico v. City of N.Y.*,
132 F.3d 145 (2d Cir. 1998)....12, 14, 17

*Dixon v. Int'l Fed'n of Accountants*,
416 F. App'x 107 (2d Cir. 2011) ....19

*Fenner v. News Corp.*,
2013 WL 6244156 (S.D.N.Y. Dec. 2, 2013) ....26

*Guzman v. News Corp.*,
2013 WL 5807058 (S.D.N.Y. Oct. 28, 2013)....26

*Maynard v. Montefiore Med. Ctr.*,
2021 WL 396700 (S.D.N.Y. Feb. 4, 2021)....6

*McCalla v. City of New York*,
2017 WL 3601182 (S.D.N.Y. Aug. 14, 2017)....12

*Mickelsen v. Bertelsmann, Inc.*,
2011 WL 4357498 (S.D.N.Y. Sept. 19, 2011)....................................................................16

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102 (2d Cir. 2013)..................................................................................................18

*Moy v. Perez*,
712 F. App'x 38 (2d Cir. 2017) ....................................................................................10, 11

*Paupaw-Myrie v. Mount Vernon City Sch. Dist.*,
653 F. Supp. 3d 80 (S.D.N.Y. 2023)......................................................................................19

*Pineda v. ESPN, Inc.*,
2019 WL 6255199 (D. Conn. Nov. 22, 2019) .........................................................................26

*Rahman v. Limani 51, LLC*,
2022 WL 3927814 (S.D.N.Y. Aug. 31, 2022).........................................................................24

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)...............................................................................................................12

*Robinson v. De Niro*,
739 F. Supp. 3d 33 (S.D.N.Y. 2023)......................................................................................19

*Sattar v. Johnson*,
129 F. Supp. 3d 123 (S.D.N.Y. 2015), *aff'd sub nom.* 669 F. App'x 1 (2d Cir.
2016) ...............................................................................................................................7, 11

*Shiflett v. Scores Holding Co.*,
601 F. App'x 28 (2d Cir. 2015) ..............................................................................................25

*Sivio v. Vill. Care Max*,
436 F. Supp. 3d 778 (S.D.N.Y. 2020).........................................................................7, 17, 20

*Smith v. New York & Presbyterian Hosp.*,
440 F. Supp. 3d 303 (S.D.N.Y. 2020).....................................................................................19

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)...............................................................................................................12

*Stinson v. Morningstar Credit Ratings, LLC*,
2024 WL 3848515 (S.D.N.Y. Aug. 16, 2024).........................................................................19

*Tillery v. New York State Off. of Alcoholism & Substance Abuse Servs.*,
739 F. App'x 23 (2d Cir. 2018) ..............................................................................................11

*Tsaganea v. City Univ. of New York, Baruch Coll.*,
441 Fed. Appx. 12 (2d Cir. 2011).....................................................................................9, 10, 11

*United States v. New York City Dep't of Educ.*,
407 F. Supp. 3d 365 (S.D.N.Y. 2018)....7, 13, 14

*Whipple v. Reed Eye Assocs.*,
524 F. Supp. 3d 76 (W.D.N.Y. 2021)....21, 23

*White v. Washington Nursing Facility*,
206 F. Supp. 3d 137 (D.D.C. 2016)....22, 23

*Williams v. New York City Dep't of Educ.*,
2021 WL 1178118 (S.D.N.Y. Mar. 29, 2021)....16

**Statutes**

New York City Human Rights Law.... *passim*

**Other Authorities**

Fed. R. Civ. P. 56(a)....6

## PRELIMINARY STATEMENT

No reasonable jury could find that defendants retaliated against plaintiff for complaining that Marie-Pierre Varin ("Varin"), the then-Director of Human Resources for Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group ("Theatrical Group"), was antisemitic. After this Court dismissed the religious discrimination claim plaintiff predicated on a six-year-old retweet, plaintiff had ample opportunity to discover and develop evidence of defendants' purported retaliation.[1] Instead, plaintiff has repeatedly admitted he only has strong opinions, but no facts to support those allegations. As a result, the record contains no direct evidence of retaliation or of pretext to rebut defendants' legitimate, nonretaliatory reasons for the alleged unfavorable treatment, and certainly no evidence that could create a genuine dispute about a single material fact. Indeed, all plaintiff has to support his claims is his conjecture, his unproven assumptions, and a reckless claim that everyone who does not support his allegations is a liar.

In fact, plaintiff concedes that Varin "stepped back" from decisions affecting his employment after his April 2020 complaint. When plaintiff was pressed at deposition about whether he had any *facts* to support his belief that Varin or her supposed allies retaliated against him, his answer was repeatedly and consistently no. Even under the relaxed standard of the New York City Human Rights Law ("NYCHRL"), more is required than plaintiff's belief that a motivating factor for the challenged employment decisions was retaliation by—or in support of—Marie-Pierre Varin.

In contrast, defendants have adduced incontrovertible evidence of the legitimate business reasons for each of the employment actions about which Mr. Farber has complained. With

---

[1] Discovery on Farber's retaliation claim examined emails, interview notes, reports, declarations and deposition testimony of numerous current and former employees who worked with plaintiff Jonathan Farber, or investigated his complaint.

respect to his claim that he was summarily denied a transfer to a different position after returning from furlough, it was a posted position, with 21 internal and external candidates, for which Mr. Farber lacked certain qualifications. Plaintiff had two interviews, was not one of the top three candidates, and has no evidence that Varin played any role in that decision, or that the decisionmakers were even aware of his complaint against her. Moreover, he *was* promoted to a Manager role in Labor Relations soon after he returned from furlough. That promotion broke the required causal chain for his retaliation claim.

Nor is there any evidence that Theatrical Group's decision to pay plaintiff $10,000 less than the Compensation group's salary recommendation in connection with his promotion was retaliatory. Plaintiff admits that the Compensation group "often" makes salary proposals that are then raised or lowered after discussions with business leaders, which is exactly what happened here. The amount of Farber's salary when he assumed the Manager position—which was $22,000 more than he was making before the promotion—and the decision to reject the Compensation group's recommendation were based on legitimate business factors including the complete shutdown of Broadway during the pandemic and concerns about aspects of Farber's performance. In any event, after his new salary was reviewed by the company at Farber's request, he was given a salary for his Manager position that was fully retroactive and was higher than his predecessor who held a *Senior* Manager role. Farber admits that administrative delays caused the compensation review to take longer than expected and none of his complaints about the process is evidence of retaliation, particularly because Farber cannot show that Varin participated in any decision related to his salary following his promotion.

Finally, Farber has no evidence that his termination for gross misconduct, which occurred after a significant period of time passed in which Farber alleges no unfavorable treatment, was retaliatory. Once again, he admits he has no facts that Varin participated in the decision to

terminate his employment or that Disney's leadership somehow "resented Farber" for filing his complaint—over three years earlier—against Varin, who allegedly was a "trusted ally" of Theatrical Group's then-President, Thomas Schumacher. When plaintiff was asked if he had any *facts* that Schumacher resented Farber for filing the complaint against Varin, he had a simple answer: "No."

Because no is the same response plaintiff has given every time he was asked if he has any facts to support his unfounded belief that he was retaliated against, defendants are entitled to summary judgment dismissing the only remaining claim in this action.

## **STATEMENT OF FACTS**

On April 16, 2020, three days before he was scheduled to begin his furlough due to the COVID-19 pandemic, plaintiff sent an email to Employee Relations outlining what he thought was Varin's religious discrimination against him. DSOF ¶ 5. From that moment on, Varin prudently removed herself from any decisions affecting plaintiff's employment. *Id.* ¶ 58. Employee Relations investigated plaintiff's complaint and did not find any evidence that Varin was antisemitic or that she had discriminated against plaintiff. *Id.* ¶ 9.

After returning from furlough,[2] plaintiff applied for a Manager position in Theatrical Group's Domestic Touring Operations. *Id.* ¶ 12. He completed the first two rounds of interviews for the position but ultimately was not selected to move on to the final-round interview with the head of the department Jack Eldon, Vice President of Domestic Touring and Regional Engagements. *Id.* ¶¶ 16, 17. Eldon and Michael Buchanan, Director of Tour Management, who was the direct supervisor for the position, both thought that plaintiff was a "good" candidate, but was not as qualified as the three individuals who moved on to the final-

[2] Unlike plaintiff who returned to his position after the furlough, 30% of Theatrical Group's workforce were permanently laid off during the pandemic. *Id.* ¶ 44.

round interview with Eldon, and certainly was not as qualified as Christopher Nunez, the candidate who was offered and accepted the position. *Id.* ¶¶ 18, 21-22. Nunez had worked in Las Vegas for 10 years on large-scale productions like *Phantom of the Opera* (a $35 million production) and *Magic Mike Live* and was a more well-rounded candidate than plaintiff, who also lacked the communication and people skills necessary for the role. *Id.* ¶ 22. Notably, neither Eldon nor Buchanan was even aware that plaintiff had filed a complaint against Varin a year earlier (*id.* ¶ 28), and Varin did not participate in the decision process for the Domestic Touring Operations position. *Id.* ¶ 30.

While plaintiff was not a top candidate for the Manager position in Domestic Touring Operations, he was promoted to Manager, Labor Relations on October 2, 2021. *Id.* ¶ 46. An employee in the Compensation group, who was responsible for looking at market data and recommending the salary for the position, proposed a salary of $95,000. *Id.* ¶ 41. That recommendation was based *only* on general industry data and salaries of similar positions across Disney affiliates and was not specific to the live-entertainment industry. *Id.* Theatrical Group employees, Andrew Flatt, then-Senior Vice President, Strategy, Marketing & Revenue, and Mario Iannetta, Vice President of Finance, Operations, and Technology, both felt this recommendation was too high. *Id.* ¶ 42. They considered three additional factors: (i) plaintiff's work performance, (ii) the fact that Theatrical Group tends to pay its employees less than other Disney affiliates, and (iii) the financial impact of the pandemic on Theatrical Group—its theaters were closed for approximately 16 months, and the company was not generating any revenue at all. *Id.* ¶¶ 42, 44. In the end, the Compensation group and Theatrical Group agreed that $85,000 was a more appropriate salary for the position under the circumstances, especially considering that plaintiff's salary was in the middle of the pack for other Managers at his level at Theatrical

Group, and they made his increased salary retroactive to the day before he returned from furlough. *Id.* ¶ 45.

After he was promoted, plaintiff complained that his salary was lower than it should have been and that it should be made retroactive to February 3, 2020, the next business day after the former-Senior Manager of Labor Relations retired, because he had covered her job duties for approximately two months. *Id.* ¶¶ 48-49. In response, beginning in March 2022, the Compensation group reviewed plaintiff's salary, and two months later in May 2022, decided it would be increased to $105,000 to bring it in line with the general market data. *Id.* ¶¶ 54, 56. They also made it retroactive to February 3, 2020. *Id.* ¶ 56. The decisionmakers who had rejected the Compensation group's original recommendation of $95,000 were not consulted or involved in the decision to increase Farber's salary to $105,000. *Id.* Notably, this increase made plaintiff's salary higher than the individual he replaced, who was a Senior Manager (a level higher than his promoted role). *Id.* ¶ 41.

Over a year later, on June 28, 2023, plaintiff met with Flatt to discuss his concerns about the performance of Tony Thomas, the new Director of Labor Relations for Theatrical Group and plaintiff's supervisor. *Id.* ¶ 66. During that meeting, plaintiff identified several employees he claimed shared his concerns about Thomas's performance issues. *Id.* ¶ 67. Employee Relations spoke with seven employees, only one of whom supported plaintiff's statements, and found that plaintiff had grossly mischaracterized his coworkers' views of Thomas. *Id.* ¶¶ 71-77, 82. Additionally, Employee Relations learned that plaintiff had been disparaging and undermining Thomas during labor negotiations, saying things like "Mr. Thomas does not know what he is doing," or "Where is Mr. Thomas?" or "Mr. Thomas is not as good as the former Director of Labor Relations, Scott Kardel." *Id.* ¶ 80. Plaintiff also told a member of the Broadway League, the national trade association for the theatre industry which works alongside Theatrical Group in

New York City on labor negotiations, that he was "termination proof" because he was the victim of antisemitism and therefore was not concerned about being disciplined for disparaging Theatrical Group. *Id.* ¶¶ 78, 79.

Plaintiff's conduct called into question his professionalism and judgment, as well as his ability to represent Theatrical Group favorably in labor negotiations moving forward. Employee Relations recommended that Theatrical Group terminate his employment. *Id.* ¶ 85. Theatrical Group employees, Flatt and Anthony Perry, who had started as the Director of Human Resources only a few weeks prior, spoke with plaintiff on September 5, 2023 to discuss Employee Relations' investigation. *Id.* ¶¶ 65, 87. They informed him that he was being terminated after he showed no remorse or contrition for his unprofessional and wholly inappropriate conduct. *Id.* ¶ 87.

## **LEGAL STANDARD**

Summary judgment is appropriate where, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" only if its resolution could affect the outcome of the suit, and it is "genuine" if the evidence is such that a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through affirmative evidence or by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *Maynard v. Montefiore Med. Ctr.*, 2021 WL 396700, at *4 (S.D.N.Y. Feb. 4, 2021). However, when the non-moving party bears the burden of proof on an issue, the moving party need not support its motion with affidavits or other material negating the opponent's claim but instead may simply point out the lack of evidence supporting the non-moving party's case. *See id*. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Sattar v. Johnson*, 129 F. Supp. 3d 123, 136 (S.D.N.Y. 2015), *aff'd sub nom.* 669 F. App'x 1 (2d Cir. 2016).

When the burden shifts to the non-moving party to identify specific facts showing there is a genuine issue for trial, the non-moving party cannot rely on a mere scintilla of evidence to support its position. *Id.* Rather, for a court to find a genuine issue for trial, the non-moving party must establish, through the record presented to the court, that it is able to prove evidence sufficient for a reasonable jury to return a verdict in its favor. *See id.* No such circumstances exist here.

"To make out an unlawful retaliation claim under the NYCHRL, a plaintiff must show that (1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Adams v. Equinox Holdings, Inc.*, 662 F. Supp. 3d 444, 461 (S.D.N.Y. 2023), *aff'd* (2d Cir. Apr. 25, 2024) (internal citation omitted). Causation can be shown by "either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 799 (S.D.N.Y. 2020) (internal quotation marks omitted).

Courts apply the *McDonnell Douglas* framework analysis to retaliation claims under the NYCHRL. *United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365, 402 n.17 (S.D.N.Y. 2018). To prevail on summary judgment, "a defendant must demonstrate that the

plaintiff cannot make out a prima facie claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual." *Adams*, 662 F. Supp. 3d at 461 (internal citation omitted). Where a defendant meets this burden, "the plaintiff must either counter the defendant's evidence by producing evidence that the reasons put forth by the defendant were merely a pretext, or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by an impermissible motive." *Id.* (internal citation omitted).

As set forth below, defendants are entitled to summary judgment because plaintiff simply cannot meet his burden here: he can neither establish a *prima facie* case of retaliation nor demonstrate that the Theatrical Group's legitimate, nonretaliatory reasons for the three employment decisions he is challenging were false and a pretext for discrimination.

## ARGUMENT

### I. PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW

#### A. It Was Not Retaliatory To Promote Plaintiff Into A Position For Which He Was Qualified And Not Into One He Was Not

##### i. Plaintiff Lacked Critical Qualifications for the Domestic Touring Operations Position

Nowhere in the complaint does plaintiff allege that Theatrical Group's "failure to promote [him]" is a basis for his retaliation claim. *See* Doc. 1, Compl. ¶ 64 ("Disney retaliated against Farber by lowering his raise, and then permitting false accusations against Farber while terminating him . . ."). Rather, as acknowledged in the complaint, plaintiff *was promoted* from Coordinator of Labor Relations to Manager of Labor Relations shortly after coming off his furlough. This type of promotion, which is in the same line of business (i.e., "Labor Relations"), is a natural transition of professional advancement. Although plaintiff was promoted instead of

being fired like 30% of the workforce during that time, he complains that he should have been promoted to another position, Manager of Domestic Touring Operations, and that Theatrical Group's failure to advance him in the interview process for that position was somehow retaliatory. DSOF ¶ 44. Not true.

Plaintiff's allegation that not getting an interview with Eldon, who was the decisionmaker for the Domestic Touring position, was "shocking" and "abnormal" (*see* Compl. ¶ 41) is factually unsupported. There is no policy or standard protocol that requires the head of a department to interview an internal candidate for a role, especially when that candidate is demonstrably less qualified for the position than other applicants. DSOF ¶ 27.[3] Thus, for example, the other internal candidate who applied for the same manager position as plaintiff did not even make it to the second-round interview. *Id.* Accordingly, Theatrical Group's decision not to have plaintiff interview with Eldon did not deviate from any purported standard protocol and was consistent with the intended purpose of the interview process, which was to advance only those candidates who were the most qualified for the position.

The Second Circuit has made clear that when evaluating an individual's qualifications as part of a hiring or promotion decision, "the court's role is not to second guess [an employer's] judgment absent some evidence to raise an issue of fact as to a [retaliatory] motive." *Tsaganea v. City Univ. of New York, Baruch Coll.*, 441 Fed. Appx. 12, 14 (2d Cir. 2011) (affirming summary judgment on Title VII discrimination claim when plaintiff was less qualified than the candidates who were interviewed). While plaintiff may disagree with Theatrical Group's explanation for not advancing him in the interview process, that disagreement cannot preclude

[3] Plaintiff admitted that there was no formal protocol requiring a department head to interview an internal candidate and stated that being interviewed by the department head was just his understanding from working at Theatrical Group. *See* DSOF ¶ 27.

summary judgment. *See Concepcion v. City of New York*, 2016 WL 386099, at *14 (S.D.N.Y. Jan. 29, 2016), aff'd, 693 F. App'x 31 (2d Cir. 2017) (concluding that the plaintiff's "subjective assessment of her own qualifications [were] insufficient to create a genuine factual issue as to whether the [defendant's] proffered reasons for its hiring decisions are pretext for discrimination"). That is because a federal district court does not sit as some kind of super-personnel department second guessing the promotion decisions made by private companies, and this is particularly so when the evidence of retaliation is nonexistent. *See Moy v. Perez*, 712 F. App'x 38, 42 (2d Cir. 2017) ("Title VII is not an invitation for courts to sit as a super-personnel department that reexamines employers' judgments") (internal citation omitted).

Here, the undisputed evidence shows that the three candidates chosen for the final round of interviews for the Domestic Touring Operations position were more qualified than plaintiff. *Id.* ¶¶ 21-22. This position required that the manager be responsible for working with venues to schedule tour engagements and performances across the country for three touring productions, including *Frozen* and *The Lion King*, which includes handling unique variables at each of the venues, such as creating performance schedules and determining different seat prices. *Id.* ¶ 14. It also required someone with strong communication skills to manage vendor relationships and ensure that these large-scale productions were able to relocate around the country seamlessly. *Id.* ¶ 19. The three individuals selected to move onto the final round had more experience than plaintiff in key areas such as box offices, ticket sales, marketing, and general management. *Id.* ¶¶ 21-23.[4] The candidate who was ultimately selected for the role, Nunez, worked in Las Vegas

[4] Plaintiff did not know anything about the interviews with these three candidates, their respective qualifications, or how the decision was made to select one of them for the role. *Id.* ¶ 26. For example, one candidate had previously toured with multiple rock bands and had worked at the Kimmel Center for Performing Arts, a venue with which Theatrical Group had done a significant amount of business. *Id.* ¶ 21. The second candidate worked as a Company Manager at the Roundabout Theatre Company, Inc., which is a large theater non-profit in New (cont.)

for 10 years on large-scale productions like *Phantom of the Opera* (a $35 million production) and *Magic Mike Live*. *Id.* ¶ 22. Nunez's experience, which was directly applicable to the Manager position, involved pricing tickets for venues, overseeing venue construction, executing payroll, managing company housing, and developing relationships with many of the vendors in the industry. *Id.*[5]

In contrast, plaintiff "was a good candidate, not an exceptional candidate," and all three interviewers agreed he lacked the work experience of the top candidates and had problems communicating with others, a critical part of the job. *Id.* ¶¶ 18-19. While plaintiff may disagree with this assessment of his qualifications, it is not for the Court to second guess it. *Moy*, 712 F. App'x at 42; *Tsaganea*, 441 F. App'x at 14. Accordingly, the undisputed evidence shows that defendants had a legitimate, nonretaliatory reason for not selecting plaintiff for the Domestic of Touring Operations position. *See*, *e.g.*, *Tillery v. New York State Off. of Alcoholism & Substance Abuse Servs*., 739 F. App'x 23, 26 (2d Cir. 2018) (affirming summary judgment on Title VII discrimination claim when the person hired over plaintiff had more relevant experience for the position); *Sattar*, 129 F. Supp. 3d 123 at 145 (granting summary judgment on Title VII retaliation claim when plaintiff was not selected for a position because the other candidate had more relevant experience applicable to the position).

---

York City, as well as for John Miller Music, one of the music contractors in the theater business that developed and managed budgets for Broadway and Off-Broadway productions. *Id.*

[5] Plaintiff may argue that Nunez was not qualified because he allegedly told plaintiff that "he was not qualified for the job and he was making it up as he goes along." *Id.* ¶ 24. Plaintiff also testified that Nunez is credible and reliable. But Nunez, who no longer works at Theatrical Group, contradicted this testimony and stated under oath is that he never told Farber or anyone else that he was not qualified for the job. *Id.* ¶¶ 24, 25. He believes he was imminently qualified for the position he was offered. *Id.* ¶ 25.

#### ii. Plaintiff Cannot Establish That the Theatrical Group's Reason Not To Select Him for a Position for Which He Was Not Qualified Was Pretextual or Motivated In Part By Retaliation

There is simply no evidence from which a trier of fact could conclude that Theatrical Group's reason for not selecting plaintiff for the Domestic Touring Operations position is false and that retaliation for making a complaint a year earlier was the real reason he did not advance to the final round of interviews. And to defeat summary judgment, plaintiff must introduce significantly probative evidence demonstrating that Theatrical Group's legitimate, nonretaliatory reason is false or motivated in part by retaliation. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000);[6] *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."). Hard evidence is exactly what plaintiff is lacking here.

*First*, neither of the decisionmakers for the Domestic Touring Operations position—Eldon or Buchanan—knew that plaintiff had filed a complaint against Varin. DSOF ¶ 28. And plaintiff has conceded that his only contrary "fact" is the conjecture of two people in his department who told him they "thought" Eldon knew about the complaint. *Id.* But they were wrong and the speculation of two individuals who have not testified under oath in this action is insufficient as a matter of law to raise a general issue of material fact about what Eldon and Buchanan knew when each of them has declared under penalty of perjury that they had no idea that Farber had complained about Varin. *Id.* Even the employee who plaintiff alleges filed a

[6] *McCalla v. City of New York*, 2017 WL 3601182, at *30 (S.D.N.Y. Aug. 14, 2017) ("After *Reeves*, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the *McDonnell Douglas* analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis is necessary.")

"complaint" on his behalf testified that any notions she had about whether people knew about Farber's complaint against Varin were a "conspiracy theory that [she] came up with in [her] head." *Id*. ¶ 34.

*United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365 (S.D.N.Y. 2018) is instructive. There, the court granted summary judgment on plaintiff's retaliation claim under the NYCHRL where the plaintiff, who was a schoolteacher, alleged that her employer had engaged in retaliation by preventing her from obtaining a position at a different school. *Id*. at 404-05. The only evidence plaintiff presented to support her claim was that the principal at the hiring school "was initially enthusiastic about appointing her to fill the position" until she allegedly spoke with the plaintiff's principal. *Id*. at 405. But, the basis for plaintiff's "belief" that the two principals spoke to each other was a document which allegedly indicated that the two principals had spoken but which had not been identified or produced in the litigation. *Id*. The court concluded that plaintiff's testimony about a document not in evidence and referring "to what someone else said [which] contains multiple levels of inadmissible hearsay" cannot be considered on summary judgment. *Id*. Similarly here, plaintiff's hearsay testimony about the "thoughts" of two other employee does not raise a triable issue of fact and cannot sustain his retaliation claim, particularly since the individuals have sworn under oath that they knew nothing about the complaint.

*Second*, it is undisputed that Varin was not involved in the hiring or interview process nor was she part of the decision-making regarding who would be selected for the Domestic Touring Operations position. Indeed, the two decisionmakers for this position (Eldon and Buchanan) both swore under penalty of perjury that Varin was not involved or consulted in the hiring or recruitment process for the Manager position. DSOF ¶¶ 30, 35. Additionally, during Varin's

deposition, she testified under oath that she was not in any way involved with who was selected for that position:

> Q. Did you have any role in who [Eldon] selected for the role that [Jon] Farber applied to?
>
> A. I did not.
>
> Q. Did you ever discuss [Jon] Farber's candidacy for the role in [Eldon]'s department . . .?
>
> A. I did not.
>
> Q. What about anyone else?
>
> A. I did not.

*Id.* ¶ 30. When asked about Varin's involvement, plaintiff conceded that he had "no documentation" to support his contention and instead merely assumed that she would have been involved because of her role in Human Resources. *Id.* This conclusory allegation, which is based on pure speculation, is insufficient as a matter of law to show pretext. *See New York City Dep't of Educ.*, 407 F. Supp. 3d at 405; *D'Amico v. City of N.Y.*, 132 F.3d at 149.

*Third*, plaintiff's only allegation in the complaint about this issue, namely that "a member of Human Resources [Jennifer Vaughan] preemptively filed a retaliation complaint on behalf of Farber when" he did not advance in the interview process (Compl. ¶ 41), has been proven to be false. Paragraph 41 of the complaint was read to Vaughan at her deposition, and she unequivocally testified: "that is not true." DSOF ¶ 32. Instead, Vaughan testified that she had merely raised a *question* about the propriety of Farber not moving to a final-round interview because Farber had planted the seed with her that Eldon and Varin were close. *Id.* She also testified, however, that she did not know if Eldon was even aware of Farber's complaint against Varin, and she did not have any knowledge about the selection process for the job or who had even applied. *Id.* ¶ 34. "I had no information," she testified. *Id.* ¶ 34. In any event, whether

Vaughan's conduct is characterized as raising a question or filing a complaint is insufficient to raise a genuine issue of material fact about whether the decision not to advance Farber to the final-round of interviews was retaliatory. Employee Relations thoroughly investigated the question Vaughan raised and found there was nothing to it. *Id.* ¶ 36. In other words, Employee Relations found that retaliation played no part in Eldon and Buchanan's decision not to advance Farber to the final round. And Farber does not have a scintilla of contrary evidence.

### B. There Is No Evidence That Plaintiff's Increased Salary After His Promotion Was Retaliatory

#### i. Plaintiff's Initial Salary of $85,000 Was In Accordance with Other Theatrical Group Managers and the Live-Entertainment Industry

Plaintiff's contention that the failure to pay him more than $85,000 when he was promoted to Manager, Labor Relations in October 2021 was retaliatory fares no better. Theatrical Group has demonstrated that it had legitimate, nonretaliatory reasons for rejecting the Compensation group's higher salary recommendation for plaintiff's promotion. The evidence shows that the Compensation group's recommendations are often a starting point for discussions with the business leaders about an appropriate salary. In this case, the Compensation group's initial recommendation was based on general market data and failed to take into account factors specific to Theatrical Group or to the live-entertainment industry as a whole. *Id.* ¶ 41. Once the Theatrical Group and the Compensation group discussed these factors, *i.e.*, that (i) Theatrical Groups pays less than other subsidiaries of TWDC because salaries of workers in the live-entertainment industry are less than in other industries; (ii) the pandemic negatively impacted Theatrical Group's financial position; and (iii) Theatrical Group had some performance concerns about plaintiff, the two groups came to a joint decision that the $85,000 salary was appropriate. *Id.* ¶ 46.

And there is no truth to plaintiff's allegation that a salary of $85,000 was "well below the parity range between same-level Managers" (Compl. ¶ 44). In fact, as reflected in the chart below, plaintiff's increased salary was in the middle of the pack for managers at his P4 compensation level at Theatrical Group and the two managers who made more than he did had been at the company longer:

| **Employee** | **Role** | **Salary (as of March 2022)** |
|---|---|---|
| Employee 1 | Manager, Creative Development | $81,820.63 |
| Employee 2 | Manager, Sales & Operations | $82,209.14 |
| Jonathan Farber | Manager, Labor Relations | $87,125.00 |
| Employee 3 | Manager, Creative-Licensed Partnerships | $97,392.94 |
| Employee 4 | Manager, Product Operations | $104,000.00 |

DSOF ¶ 45.

And there is no evidence in this record that retaliation played any role in Theatrical Group's legitimate business reasons for determining what plaintiff's salary should be after he was promoted in the middle of a world-wide pandemic that shuttered Broadway. *See Mickelsen v. Bertelsmann, Inc*., 2011 WL 4357498, at *7 (S.D.N.Y. Sept. 19, 2011) (holding that defendants articulated a legitimate nondiscriminatory reason for reducing plaintiff's compensation because defendant publishing company was experiencing "very difficult times" in its industry). To the contrary, the fact that plaintiff was promoted *after* his complaint against Varin is an intervening cause, which breaks the causal link between the alleged protected activity and his salary determination, and therefore is a separate reason for granting summary judgment. *Williams v. New York City Dep't of Educ*., 2021 WL 1178118, at *10-11 (S.D.N.Y. Mar. 29, 2021) (granting summary judgment against Title VII and NYCHRL retaliation claims where

plaintiff's promotion was an intervening positive employment action which broke any causal link).

And the Compensation group's subsequent decision to increase plaintiff's salary after the salary review he requested (*see* DSOF ¶¶ 54, 56-57), in no way renders the initial salary decision unreasonable or retaliatory. Business leaders in different departments exercising their independent judgment can legitimately disagree about employment terms without those disagreements being unlawful. His salary after this increase was even higher than the salary of the Senior Manager (a higher-level position) he replaced, who was far more experienced, *id.* ¶ 41, suggesting not that the first salary was too low, but rather that the second salary was perhaps too high because it was based on general industry data and not data specific to the live-entertainment industry or to the Theatrical Group. Either way, what is beyond doubt is that such matters are for a company's business leaders and compensation partners to work out, and not for the courts to second guess at the plaintiff's urging.

#### ii. Plaintiff Cannot Establish Pretext Or That Theatrical Group's Salary Decision Was Motivated In Part By Retaliation

While plaintiff may disagree with the rationale for setting his salary at $85,000, his disagreement is not enough to establish pretext, and plaintiff has not produced *any* evidence, let alone "hard evidence," that the nonretaliatory reasons supporting plaintiff's initial decision to set his salary at $85,000 were pretextual. *D'Amico*, 132 F.3d at 149; *Beddoe v. Icahn Sch. of Med. at Mount Sinai*, 2024 WL 989592, at *7 (S.D.N.Y. Mar. 7, 2024) (holding that plaintiff's disagreement with defendant's legitimate business decision to reduce her pay cannot establish pretext); *Sivio*, 436 F. Supp. 3d at 802 ("[E]ven under the more relaxed NYCHRL standard, when Plaintiff's sole evidence of pretext is the temporal proximity between Plaintiff's complaints and Defendants' discipline, a NYCHRL retaliation claim cannot survive summary

judgment if the employer has shown a nonretaliatory reason for the plaintiff's mistreatment.") (internal citations omitted).

Here, the undisputed evidence shows that Varin was not involved in the salary review process or in the initial decision to set his salary at $85,000. *Id.* ¶¶ 57-62. In fact, Varin testified that she "was not involved" in the conversations surrounding plaintiff's salary and did not even "know who had the conversation at the time." *Id.* ¶¶ 58, 62. As plaintiff himself acknowledged, Varin "did not want to be involved in conversations that would directly impact [plaintiff's] career at [Theatrical Group], because [she] felt it wouldn't be appropriate considering that there had been the complaint." *Id.* ¶ 58-59. She was copied on correspondence regarding plaintiff's salary for awareness because there was no Director of Human Resources at the time. *Id.* ¶ 61. The fact that she was copied, however, is not enough to raise an issue of fact that she was involved in such way to render the decisions retaliatory. It is undisputed that Varin did not participate in any of the discussions or provide any input in determining plaintiff's salary when he was promoted to Manager of Labor Relations. *Id.* ¶ 62. Absent such a showing, plaintiff cannot begin to establish pretext for Theatrical Group's legitimate business decisions.

## C. <u>Plaintiff's Termination, Which Occurred More Than Three Years After His Complaint, Could Not Possibly Be Motivated By Retaliation</u>

### i. Plaintiff Cannot Establish the Causation Element of a *Prima Facie* Case of Retaliatory Termination

To establish a *prima facie* case of retaliation under the NYCHRL, plaintiff must prove that he complained about an activity prohibited by the anti-discrimination laws and that, *as a result*, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013). This means that a plaintiff must satisfy each of the following three requirements: protected activity, causation, and conduct likely to deter an employee from complaining.

Plaintiff's failure to establish a triable issue as to the lack of causation involving Theatrical Group's termination decision, which occurred over three years after his complaint and two years after he returned from furlough, compels summary judgment for defendants.

To support a causal connection between the protected activity and an adverse employment action, "courts 'uniformly hold that the temporal proximity must be very close [in time].'" *Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 104 (S.D.N.Y. 2023) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). While the Second Circuit has not drawn a bright line in defining a temporal gap which is too attenuated to establish causation for a retaliatory action, courts have consistently held that a passage of more than two months between the protected activity and the adverse employment action is insufficient to support an inference of causation. *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) (finding that the passage of four months between complaint and termination was insufficient, standing alone, to establish a causal connection for purposes of plaintiff's retaliation claim); *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 343 (S.D.N.Y. 2020) (concluding that a three and four-month gap between a complaint and an employer's alleged retaliatory act is insufficient to establish causation); *Stinson v. Morningstar Credit Ratings, LLC*, 2024 WL 3848515, at *24 (S.D.N.Y. Aug. 16, 2024) (granting summary judgement against Title VII and NYCHRL retaliation claims where retaliatory act occurred five months after protected activity); *Robinson v. De Niro*, 739 F. Supp. 3d 33, 114-115 (S.D.N.Y. 2023) (granting summary judgment on NYCHRL retaliation claim because "[o]ver two months lapsed between Plaintiff's . . . [protected activity] and [Defendant's retaliatory act] and 'most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference'") (internal citations omitted).

As addressed above, plaintiff's termination occurred over three years after his alleged protected activity and over two years after he returned from his furlough and was subsequently promoted. DSOF ¶¶ 5, 46, 63. And, plaintiff does not allege a single instance of retaliation during the 15 months between his May 2022 salary increase and the September 2023 termination of his employment. *Id.* ¶ 63. This temporal gap between the protected activity and termination is far too attenuated to establish causation, as shown by the line of cases discussed above where courts have granted summary judgment under similar circumstances.

Absent this temporal proximity, plaintiff must present evidence of retaliatory animus directed at him, which he cannot do. *Sivio*, 436 F. Supp. 3d at 799. There is absolutely no evidence of retaliatory intent on the part of the individuals who were involved in the decision to terminate him. *Id.*; *Bantamoi v. St. Barnabas Hosp*., 146 A.D.3d 420, 420 (N.Y. App. Div. 2017) (finding no causation when five months passed between the protected activity and alleged adverse employment action and there was no evidence of retaliatory intent). Three decisionmakers (Flatt, Liang, and Perry) have sworn under oath that plaintiff's complaint against Varin did not come up when deciding to terminate him and that Varin was not involved in the decision to terminate plaintiff. DSOF ¶ 89. Plaintiff admits he has no contrary facts. *Id.* ¶ 90.

**ii. Theatrical Group Had Legitimate, Nonretaliatory Reasons for Terminating Plaintiff's Employment**

Even if plaintiff could establish a *prima facie* case of retaliation (which he cannot), Theatrical Group terminated him for legitimate, nonretaliatory reasons. As described *infra*, the evidence shows that in the summer of 2023 when Theatrical Group investigated plaintiff's

complaints about his supervisor, Thomas, it discovered certain unsettling comments by plaintiff that led to their mistrust of his ability to perform his duties successfully.[7] *Id*. ¶ 78.

*First*, Theatrical Group learned from a third party (Jason Laks), who was then-Head of Labor Relations for the Broadway League, that plaintiff was disparaging his supervisor (Thomas) in front of third parties during labor negotiations while he was representing Theatrical Group. *Id.* ¶ 80. For example, plaintiff would say in labor negotiations that "Mr. Thomas does not know what he is doing," or "Where is Mr. Thomas?" or "Mr. Thomas is not as good as the former Director of Labor Relations, Scott Kardel." *Id.* Not only did these comments undermine Thomas' authority and his ability to successfully negotiate on behalf of Theatrical Group, but as Laks himself stated when providing this information unsolicited, it is "not a good look" to have one employee openly condemning his supervisor. *Id.* This behavior was shocking and called into question plaintiff's professionalism and judgment, which are required qualities for any employee, particularly one like plaintiff who has an external-facing role. It would have been reasonable for Theatrical Group to terminate plaintiff for this reason alone. *See Whipple v. Reed Eye Assocs*., 524 F. Supp. 3d 76, 97 (W.D.N.Y. 2021) (granting summary judgement on Title VII and NYSHRL retaliation claim where plaintiff had been terminated after making disparaging comments about the defendant and it was enough that the owners were told she had made the remarks even though plaintiff denied making some or all of them).

*Second*, while plaintiff claimed that several employees would support his performance-related complaints about his supervisor, Employee Relations spoke to seven individuals he identified, and only one person corroborated plaintiff's allegations. DSOF ¶¶ 71-77. The others

---

[7] Plaintiff's allegation that he was terminated for sharing inside information about labor negotiations with a former employee (*see* Compl. ¶ 49) is not true and is not supported by any evidence in the record.

did not endorse plaintiff's allegations, and in fact, speaking with them revealed that he grossly mischaracterized many of their statements. *Id.* For example, plaintiff alleged that two employees would go directly to him to get things done (implying that Thomas could not be trusted to handle tasks), but instead they went to plaintiff for information because of convenience, not because they were directed not to go to Thomas or lacked confidence in his abilities. *Id.* ¶ 72. As another example, plaintiff alleged that Lindsey Williams, a Human Resources professional at The Walt Disney Studios, agreed with him that Thomas did not know how to do his job. *Id.* ¶ 73. Williams denied saying, hearing, or thinking that Thomas does not know how to do his job. *Id.* And these are just a few examples of the type of misrepresentations plaintiff made about his co-workers' views of his supervisor. Given that nearly all of the allegations plaintiff made about his supervisor were completely false or egregiously overstated, it called into question Farber's integrity as an employee and his ability to represent Theatrical Group in labor negotiations. *Id.* ¶ 87. *See White v. Washington Nursing Facility*, 206 F. Supp. 3d 137, 147-48 (D.D.C. 2016) (granting summary judgment on Title VII retaliation claim when plaintiff did not provide any evidence contradicting his employer's reasonably held belief that he had exhibited dishonesty by falsifying patient records).

*Third*, at an after-party event for a Broadway show, plaintiff made a negative comment about Theatrical Group to a third party. *Id.* ¶ 79. When Laks (who worked for the Broadway League) told him that he should be careful about criticizing his current employer because you never know who is listening, plaintiff responded that he was "termination proof" because he was the "victim of antisemitism." *Id.*[8] This is a completely inappropriate statement to make to

[8] Plaintiff claims that he did not make either statement to Laks. *Id.* ¶ 84. However, there is no evidence to suggest that Laks would fabricate such statements, which he made to (cont.)

someone outside the company with whom Theatrical Group regularly works, particularly given that the investigation did not conclude that he was a victim off antisemitism. *Id.* ¶ 9. Again, because plaintiff made these statements to a third party who sits at the labor negotiation table with Theatrical Group, this raised concerns about plaintiff's lack of professionalism and judgment, as well as his ability to carry out his responsibilities.

In light of what Theatrical Group learned during its investigation, it was recommended that plaintiff be terminated. *Id.* ¶ 85. But in an effort to give plaintiff one last chance, two of the decisionmakers (Flatt and Perry) scheduled a call on September 5, 2023, with the understanding that if plaintiff showed contrition for his actions, they would not terminate him. *Id.* ¶ 86. Plaintiff did not show any contrition and instead stated there was "hearsay" on both sides and that he did not want to comment any further. *Id.* ¶ 87. As a result, Theatrical Group went forward with terminating plaintiff's employment and did so for legitimate, nonretaliatory reasons. *Id.*; *see Whipple*, 524 F. Supp. at 76; *White*, 206 F. Supp. 3d at 147-48.

**iii. There Is No Evidence That Theatrical Group's Legitimate, Nonretaliatory Reasons for Terminating Plaintiff Were Pretextual or Motivated In Part By Retaliation**

There is no evidence that would permit a trier of fact to conclude that Theatrical Group's reasoning for terminating plaintiff was pretextual or motivated in part by retaliation. Plaintiff testified that he had no facts to support his allegation that executive leadership resented him for filing a complaint against Varin or discriminated against Jewish people in general. DSOF ¶¶ 90, 92-94. And like the other employment decisions made after the filing of plaintiff's complaint on April 16, 2020, Varin was not involved in the decision to terminate plaintiff and did not voice

---

Theatrical Group unsolicited. Furthermore, when Thomas started at Theatrical Group, plaintiff used the same words, telling him that he was "termination proof." *Id.* ¶ 84.

any opinion on the termination. *Id.* ¶ 87. She also purposefully removed herself from the decision-making process because she did not want there to be any appearance of impropriety. *Id.* ¶ 58.

Varin's awareness of plaintiff's termination is not enough to show that she influenced the decision in any way. *Id.* ¶ 90. Three decisionmakers (Flatt, Liang, and Perry) have sworn that Varin was not involved in the decision to terminate plaintiff, and at no point during the process was there any discussion about plaintiff's complaint against Varin. *Id.* ¶ 89. The only reason Varin was copied on emails regarding plaintiff's termination was that the Director of Human Resources, Perry, had recently started in his position and thought he may need to tap into Varin's institutional knowledge to resolve any issues that he could not address. *Id.* ¶ 90. But that never occurred. *Id.* ¶ 89. As such, plaintiff's failure to establish a triable issue as to pretext warrants granting summary judgment for defendants.

## II. PLAINTIFF HAS FAILED TO SHOW THAT THE WALT DISNEY COMPANY HAS "A SINGLE EMPLOYER" RELATIONSHIP WITH THE THEATRICAL GROUP THAT EMPLOYED PLAINTIFF

At all times relevant to this case, plaintiff was employed by Theatrical Group and there is no evidence which would show that Theatrical Group and TWDC are a single employer. The "single employer" doctrine is one of two "recognized doctrines that enable an employee in certain circumstances to assert employer liability against an entity that is not formally his or her employer." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005).[9] "This Circuit examines four factors in order to assess whether two nominally distinct entities are actually a single employer: '(1) interrelation of operations, (2) centralized control of labor

[9] This doctrine has consistently been applied by district courts in this Circuit to the NYCHRL. *See, e.g.*, *Rahman v. Limani 51, LLC*, 2022 WL 3927814, at *6 (S.D.N.Y. Aug. 31, 2022).

relations, (3) common management, and (4) common ownership or financial control.' 'Although no one factor is determinative[,] *control of labor relations is the central concern.*'" *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) (emphasis added) (internal citations omitted). "In determining whether a plaintiff adequately alleges centralized control over labor relations—the most important prong in the four-part test—the central question is *what entity made the final decisions regarding employment matters related to the person claiming discrimination*." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 227 (2d Cir. 2014) (emphasis added) (internal quotation marks omitted).

Here, it is undisputed that no one involved in the employment decisions regarding plaintiff was employed by, or even reported to someone who was employed by, TWDC. TWDC is broken down into three operating units which have corporate status separate and apart from TWDC: Corporate, Entertainment, and Experience. DSOF ¶ 98. The Entertainment operating unit, which is relevant here, has business segments (including Walt Disney Studios) that report into it. *Id*. And within Walt Disney Studios, the structure is broken down further into separate entities, one of which is Theatrical Group. *Id.* The only individuals involved in the decisions relating to plaintiff who were not employed by Theatrical Group—namely, Employee Relations or Compensation—were either employed by the Corporate operating unit or by Walt Disney Studios, both of which are separate and distinct legal entities from TWDC. *Id.* ¶¶ 6, 40, 54 -55. As a result, plaintiff cannot show that TWDC made *any* decisions with respect to his employment, let alone the decisions at issue: whether to promote him, determine his pay, or terminate his employment. That is because these decisions were made by separate and distinct entities, which is why when TWDC's corporate representative, Tanya Menton, was asked: "Does the Walt Disney Company know who John Farber is?" her response was "Nobody at that level would know [him]." *Id.* ¶ 97.

This is not surprising because TWDC is an indirect parent of Theatrical Group which is several layers down on the corporate structure chart. It is for this reason that a parent company is not ordinarily liable for the employment discrimination of its subsidiary unless requirements of single employer or joint employer doctrine are satisfied. *Guzman v. News Corp.*, 2013 WL 5807058, at *8 (S.D.N.Y. Oct. 28, 2013). Indeed, corporate entities are presumed to have separate existences and there is a strong presumption that a parent company is not the employer of its subsidiary's employees. *See Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 134 (S.D.N.Y. 2020); *Fenner v. News Corp*., 2013 WL 6244156, at *9 (S.D.N.Y. Dec. 2, 2013). And at least one court has determined that the single employer doctrine was not satisfied when dismissing TWDC from an employment discrimination matter brought by a former ESPN employee. *Pineda v. ESPN, Inc.*, 2019 WL 6255199, at *4 (D. Conn. Nov. 22, 2019) ("TWDC's ownership of ESPN [does not] make it liable for ESPN's alleged discriminatory acts.). The same outcome is warranted here because plaintiff has not and cannot present any evidence which shows that TWDC and Theatrical Group are a single employer.

In sum, defendants' evidence remains unrebutted that TWDC was not involved in the decisions to promote, to determine pay or to terminate the employment of plaintiff, nor did it control plaintiff's work conditions. Because plaintiff has failed to raise a triable issue under his theory of joint or single employer, summary judgment is warranted as to TWDC.

## CONCLUSION

For all the foregoing reasons, defendants respectfully request that summary judgment be granted in their favor.

Dated: New York, New York
March 18, 2025

Respectfully Submitted,

McDERMOTT WILL & EMERY LLP

By: */s/ Kerry Alan Scanlon*

Kerry Alan Scanlon (admitted *pro hac vice*)
David Beach
500 North Capitol Street, N.W.
Washington, D.C. 20001
Telephone: (202) 756-8696
Facsimile: (202) 591-2791
kscanlon@mwe.com
dbeach@mwe.com

*Attorneys for Defendants*

**CERTIFICATE OF WORD COUNT**

I hereby certify that this brief complies with Local Rule 7.1(c) and that the brief contains 8,362 words.

By: *_/s/ Kerry Alan Scanlon_*
Kerry Alan Scanlon