UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jonathan Farber,<br><br>                              Plaintiff,<br><br>            -against-<br><br>The Walt Disney Company et al.,<br>                              Defendants. | 24-cv-391 (AS)<br><br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

This is a retaliation case brought against The Walt Disney Company and its subsidiary, Disney Theatrical Group, which employed plaintiff Jonathan Farber. Defendants have moved for summary judgment. For the reasons below, that motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In 2014 an employee of the Disney Theatrical Group named Marie-Pierre Varin retweeted the following: "Why does 'Jesus Save?' Cuz he's a Jew and loves coupons ;)." Dkt. 1 ¶ 3. This case stems from the years-long fallout.

Three years later, Jonathan Farber (who is Jewish) was hired by the Disney Theatrical Group as a Labor Relations Coordinator. Dkt. 62 ¶ 1. After another three years at the Theatrical Group, Farber emailed the senior director of employee relations at Walt Disney Studios (a parent company of the Theatrical Group) with a "chronological listing of discriminatory events that have taken place against [him] by Marie-Pierre Varin, Director of HR for Disney Theatrical Group." Dkt. 55-4 at 1. He cited her tweet as well as a series of interactions that led him to believe that Varin had discriminated against him. These include:

- In July, 2018, Farber was asked by his boss Scott Kardel whether he'd want to apply for an industry designation called "Broadway League Rising Stars." *Id.* He applied, but later learned that management would be deciding who to submit on behalf of the company. This was Varin's fault because, Farber says, "[i]t never dawned on [her] that the way Rising Stars was handled was wrong and should follow the protocol used in other events." *Id.*

- In August, 2018, two financial workshops were offered to employees. Varin suggested that Farber attend the "Getting Started with Your Disney Savings Plan" retirement savings workshop instead of the "Make the Most of Your Retirement Savings" workshop. *Id.*

- Starting in January, 2019, Farber took on the responsibilities of another employee who went out on medical leave, and then, in March, took on some of the responsibilities of a third employee, meaning that he worked over 60 hours per week. *Id.* He received a bonus

for this additional work, but instead of receiving the $10,000 that he expected, he received $5,000. Varin was involved with approving the bonus. *Id.* at 2.

- In December, 2019, Farber planned a retirement party for the employee whose job he covered and was told by attendees that "it was one of the best inter-office parties." *Id.* at 4. When he relayed that to Varin, she allegedly replied: "Well, that's not true," and may have suggested that the success of the party was going to his head. *Id.* at 3.

- Around this time, more senior employees had suggested to Farber that he would be promoted to take the job of the retiring employee whose party he had planned and whose job he'd covered for. *Id.* That process, which was run by Varin, proceeded very slowly. *Id.*

- And when employees were furloughed in April, 2020, because of COVID, Farber says that he asked for the reasoning behind the furlough and was told that managers were not furloughed but that non-managers were. *Id.* If he had already been promoted, Farber says, he would not have been furloughed—and he had already been doing the job of a manager. *Id.* He alleged that Varin was involved with the promotion process.

Farber concluded by noting that he wasn't sure why Varin allegedly treated him differently from others, but that he suspects it was because he is Jewish. *Id.* He cited Varin's 2014 tweet (which had since been taken down) as well as the fact that three meetings or events scheduled by HR had occurred on Jewish holidays. *Id.*

Pam Wong, the recipient of the email, kicked off an investigation of Farber's complaint. Two days after Farber's furlough went into effect, another employee responsible for the investigation put together a list of anticipated witnesses to talk to, as well as other relevant employees who she didn't anticipate interviewing. Dkts. 62 ¶ 4; 61-14. At the time, the company's policy was generally not to involve furloughed employees in investigations because it would require adding them back to the payroll. Dkt. 62 ¶ 7. When Farber returned from furlough in June, 2020, he was informed that the investigation had concluded. The investigator had interviewed Varin, Farber's boss Kardel, and one more employee and concluded that were was no evidence of religious discrimination against Farber.

With Farber back from furlough and his potential promotion still pending, Farber applied for a different promotion: as a manager in the "Domestic Touring Operations" department. *Id.* The application process involved three rounds: selection by a recruiter for an initial interview with Michael Buchanan (the director of Tour Management), and then a final interview with Jack Eldon, the hiring manager, who would consider the three finalists. *Id.* Farber's application stopped at that second step. Though Buchanan initially indicated to Farber that he'd move to the final round, Buchanan and Eldon ultimately chose to advance other candidates instead. *Id.* ¶ 17.

Farber and defendants don't agree on why he wasn't chosen. The recruiter, Buchanan, and Eldon all claim that the job involved the business side of show business, not the labor side, and Farber's experience was related to unions and products. The other candidates, by contrast, had more relevant experience. *Id.* ¶ 21. Plus, they say that they were worried about whether Farber's

"manner of interacting with others" as well as his "attitude and demeanor" were well-suited for such a client-facing role. Dkts. 55-11 ¶ 5; 55-12 ¶¶ 6–7. Farber's side of the story is that Varin was close with Eldon and so must have told him about Farber's complaint against her. Farber then says that Eldon retaliated against him for complaining about Varin. Dkt. 62 ¶ 29.

A month later, Farber was instead given the promotion he initially applied for: the labor relations manager job. *Id.* ¶ 125. But the trouble didn't stop. He was offered a salary of $85,000 a year, a big bump over his prior salary of $63,000 but less than what had initially been recommended by the compensation committee. *Id.* ¶¶ 41, 125. The employees involved with setting Farber's salary claim that they settled on a number below the recommendation because Farber's work performance was allegedly below expectation and because the recommended salary of at least $95,000 would be out of step with those of other Theatrical Group employees. *Id.* ¶ 42. Again, Farber's version of the story differs. He claims that Varin was involved with the salary decision and lowered it because he had complained about her. Farber filed a complaint about his salary and in May 2022 it was increased retroactively to $105,000 as of February 2020, with prorated back payments and raises so that his 2022 salary was $115,000. *Id.* ¶ 57.

Though the next three months were uneventful, trouble began to brew again in August when Tony Thomas became Farber's boss. *Id.* ¶ 64. A year into the new working relationship, Farber came to a higher-up named Andrew Flatt to discuss his concerns with Thomas. Afterward, Flatt sent an email to other people in HR (including Varin) documenting his conversation with Farber because he "believe[d] it's important to document" it "for reasons that will become clear below." Dkt. 55-9 at 8. The gist of it, according to Flatt's email, is that Farber felt that he did most of Thomas's job for him, that Thomas didn't work much, that Thomas had a bad attitude and was unhappy with his job, and that Thomas's colleagues didn't like or trust him. Dkts. 62 ¶ 67a–e; 55-9 at 8–11. Farber also told Flatt that he didn't like the way that Thomas communicated with him. Dkt. 62 ¶ 68. In his deposition, Farber denies having made most of the statements in Flatt's email. Dkt. 62 ¶ 70.

Another investigation kicked off. Farber and defendants disagree about whether it was into Thomas's conduct or into Farber's, but either way a senior manager of employee relations named Danton Liang spoke with many of the people that, according to Farber, had negative opinions of Thomas. *Id.* ¶¶ 71–77. These conversations didn't do much to back up what Farber allegedly said, save for a conversation with an employee who corroborated that she felt that Thomas was condescending to her and so she preferred to keep her distance from him. *Id.* ¶ 77. As a result of that conversation, Thomas allegedly received a coaching session. *Id.* ¶ 87.

But one of these conversations allegedly (according to defendants) turned up an unexpected stone. An employee revealed that Farber had made unusual comments to an executive at the Broadway League. *Id.* ¶ 78. The first comment was apparently a negative one about his employer; the second, offered after Farber was warned to be cautious about making negative comments about his employer in public, was that he could not be fired because his prior complaint about discrimination made him "termination proof." *Id.* ¶¶ 79, 82. Similarly, Thomas states that Farber told him as well that he was "termination proof" because he had previously complained about antisemitism

3

when Thomas first started. Dkt. 55-24 ¶ 2. Farber, of course, denies saying anything like that to either the Broadway League executive or to Thomas. Dkt. 62 ¶ 84.

Liang recommended that Farber be terminated for misrepresenting the views of his colleagues and for disparaging his boss to people outside the company. *Id.* ¶ 85; Dkt. 55-7 ¶ 19. Among others, Liang had spoken with Flatt (who conveyed what Farber had told him), with the Broadway League executive (who said that Farber had told him that he was termination proof and disparaged his employer), and with Farber (who denied making these allegations to Flatt and denied saying anything to the Broadway League executive). *Id.* ¶¶ 82–84. Liang concluded that Flatt and the outside executive were more credible than was Farber. *Id.* ¶¶ 83–84.

Flatt called Farber to discuss the investigation. On that call, he fired Farber, citing his lack of integrity, character, trustworthiness, and ability to represent the company externally. *Id.* ¶ 87. Farber was then placed on a "do not admit" list and barred from attending Disney events. *Id.* ¶ 128. Farber sued under the New York City Human Rights Law (NYCHRL) for religious discrimination and for retaliation. The Court previously dismissed Farber's religious-discrimination claim because he didn't link any adverse treatment to his religion. But the Court permitted his retaliation claim to proceed. Dkt. 29 at 2. Defendants have now moved for summary judgment on that claim. Dkt. 52.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## DISCUSSION

### I.    Farber's claim will go to trial, but only as to certain alleged conduct

Farber has identified four potentially retaliatory acts: (1) not including him in the investigation while he was furloughed, (2) refusing to give him a final round interview with Eldon, (3) giving him a lower salary than expected upon promotion, and (4) firing him and putting him on a "do not admit" list.

To make a retaliation claim under the NYCHRL, a plaintiff must show that: "(1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct."

*Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (2d Dep't 2021) (citation omitted). That's called the prima facie claim of retaliation. "To establish its entitlement to summary judgment in a retaliation case under ... the NYCHRL, a defendant must demonstrate that the plaintiff cannot make out a prima facie claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual." *Id.* (cleaned up); *see also Adams v. Equinox Holdings, Inc.*, 662 F. Supp. 3d 444, 461 (S.D.N.Y. 2023). As Farber points out (and defendants don't contest), defendants have only moved for summary judgment on the basis that they didn't engage in conduct that would deter protected activity, lack of causation, and non-pretextual reasons for each action.

### A.  Not interviewing Farber as part of the investigation wasn't retaliation against him

Farber has failed to create a genuine dispute of material fact as to his prima facie claim of retaliation relating to the investigation into Varin. Though Farber cites no caselaw to support the proposition that a failure to interview a complainant can meet the conduct prong of the NYCHRL, the Court assumes for a moment that it can. Even so, Farber fails to point to *any* fact suggesting "a causal connection between the protected activity and the alleged retaliatory conduct." *Bilitch*, 148 N.Y.S.3d at 246. He does not point to any facts that would suggest that Wong failed to interview him *because* he complained. So his argument boils down to the assertion that *any* failure to interview a complainant must be legally sufficient for a jury to conclude that it was caused by the complaint itself, which clearly can't be correct.

But in any event, defendants have offered a clear non-pretextual reason not to interview him. They had a policy of not interviewing complainants in typical complaint cases while they were furloughed during the pandemic because it would require putting them back on the payroll at a time of great financial stress for a company focused on live events. Dkt. 55-7 ¶ 3. Farber's furlough became effective just three days after he made his complaint, and two days *before* the investigator had even put together her list of who to interview. Dkts. 55-4 at 1; 62 ¶ 4, 61-14 at 2. Of course, they did call back an actor for an investigation—this is what Farber focuses on as his evidence of pretext. But the record unambiguously shows how different that situation was from Farber's: There, multiple people had complained about a director, creating live questions about how the show would be able to go on once Broadway reopened. Dkt 55-7 ¶¶ 3–4. That was because investigations "can take months" and "both the resident director and the principal actor had key roles in the production that could not be easily replaced," and so it was "imperative" to "avoid a situation where the complainant and director were forced to work together for any length of time while we completed the investigation." *Id.* ¶ 4. Against this, Farber merely asserts that a reasonable jury could find that "Defendants resented that Farber raised a religious-based discrimination claim against Varin," which is why he didn't get interviewed. But that is merely an assertion and he provides not a shred of evidence to back it up.

### B. Not giving Farber a final round interview wasn't retaliation against him

Farber's retaliation claim based on not getting a final round interview with Eldon fails for the same reasons: He fails to connect it to any protected activity, and he fails to put into question the non-pretextual explanation offered by defendants.

Start again with the causal connection. The record supports that there were three people involved with the promotion process: a recruiter, Buchanan, and Eldon. Dkt. 62 ¶ 15. Farber points to no evidence that suggests that Varin was involved. Instead, his argument is purely conjectural: that Eldon and Varin are friends, and so Varin (or somebody else) must have told Eldon about the complaint against her. Then, the story goes, Eldon retaliated against Farber by not advancing him to the final interview. Farber concedes that there is "no direct evidence" that Eldon was told. Dkt. 60 at 19. He instead tries to raise inferences from other evidence—but each one is a bridge too far. First, Farber points to a communication from Buchanan that there was a "very poor candidate experience" involving Farber. This, Farber says, is a smoking gun: A jury could conclude from this statement that Varin told Buchanan about the complaint. Putting aside the difficulty the Court has in connecting those dots, the other problem for Farber is that he's taken this statement entirely out of context. He's referencing a document that instead faults *Buchanan* for not delivering negative feedback to Farber in a timely manner about how his interview went. Dkt. 55-15. Here's what the full paragraph says: "I asked Michael to provide specific feedback to [Farber] about why he didn't move forward. Michael said he hadn't gotten back to [Farber] yet – very poor candidate experience. But he didn't – it fell off his radar. People avoid difficult conversations." *Id.* at 2. Next, Farber points out that when he told another employee about his situation, that employee filed a complaint on his behalf. This doesn't show anything other than that one employee believed his side of the story. Indeed, that employee later admitted under oath that her complaint was based on a "conspiracy theory that [she] came up with in [her] head" that was "based on absolutely no facts that [she] had at the time or ha[s] now." Dkt. 55-13 at 57:3–5.

Nor can Farber rebut the non-pretextual reason provided by defendants for not advancing him: He simply didn't have the relevant experience. He had a lot of experience with the labor side of shows, but none with the business-facing client side of dealing with venues. Though he insists that Varin *must* have told Eldon about the complaint, he can offer no evidence for that beyond his own speculation.

### C. Farber's salary initially being lower can proceed to trial

By contrast, Farber's arguments related to being offered a lower salary are stronger. Unlike as with his potential promotion, Varin appears to have been directly involved in setting his compensation. In her deposition, she stated that she was likely involved in compensation planning for that year. Dkt. 55-2 at 39:24–40:16. She was cc'd on emails related to the compensation decision (so she arguably was not fully recused from the process), and one email strongly suggests that Varin was involved with the compensation recommendation. Dkt. 62 ¶ 125. In that email chain, Varin is cc'd on a discussion about Farber's promotion and potential compensation. One email says that

"MP" (Varin's first name is Marie-Pierre) had "advised that [Farber] should not take on any additional duties" until some "situation was sorted." Dkt. 61-2 at 1. Later on, Flatt replied, asking: "Can the 4 of us please agree to review the comp recommendation and comparables … before we take the salary to Scott and ultimately to [Farber]?" *Id.* There were only four people on this email chain, one of whom was Varin.

That's the causal connection. The involvement of the very same person that Farber complained about in *setting* that lower salary certainly satisfies the relaxed causation prong of the NYCHRL analysis, which requires only that the retaliation "was motivated *at least in part* by an impermissible motive." *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 334 n.8 (S.D.N.Y. 2020) (citation omitted). And to be clear, offering Farber a lower salary is certainly the kind of conduct that would reasonably deter somebody from filing complaints in the future. Against that, defendants argue that offering lower salaries either routinely happens or was uniquely justified in this case because of Farber's job performance or the firm's financials. Perhaps that's true, but whether that carries the day is a factual question for the jury, not one for the Court to resolve here.

### D. Farber's claim based on his termination can go to trial

Farber was fired in 2023, two years after he raised his complaint about Tony Thomas. To recap, that chain of events began when he brought a complaint to Flatt about his new boss (Thomas), that complaint was investigated, and that investigation suggested to Liang, the investigator, that Farber lied to Flatt and made improper statements to people outside the company. That led to Liang recommending to Flatt that Farber be fired. Farber's side of the story differs—he argues that the entire investigation was a sham, motivated by the complaints he made while the investigation was pending: his complaint about not being interviewed in the investigation into Farber's complaints about Varin, his complaint (filed on his behalf by someone else) after he didn't get the promotion for the Domestic Touring Operations job, and his challenge to his lower salary. These complaints, he says, are what really led to his termination.

There's some evidence that supports Farber's account. Varin communicated with Flatt, who ultimately fired Farber, shortly after Farber's salary complaint. Flatt forwarded communications from the people who approved the salary increase to Varin, adding that Farber "is a deeply complicated employee and this decision is going to haunt all of us." Dkt. 61-5. Flatt then forwarded another communication to Varin, in which he wrote that he wanted "to avoid yet another ER complaint and investigation," and that Flatt was "angry about this salary adjustment." Dkt. 61-9 at 1. Varin was then involved *again* when Farber came to Flatt to discuss his problems with Thomas (he cc'd her on the email that he sent memorializing the conversation with Farber). Dkt. 55-9 at 8–9. On that email chain, Flatt writes that he would "rather lean into this sooner rather than later, as this situation is bound to escalate quickly." *Id.* at 8. Whether the investigation was a sham or not is a question for the jury—it turns on disputed accounts of what Farber said to Thomas, what other people said to Liang, and Varin's involvement in the entire series of events.

## II.    Walt Disney Company isn't a proper defendant

Earlier in this litigation, the Walt Disney Company moved to dismiss the claims against it "because Farber was employed by the Theatrical Group (a wholly owned subsidiary of WDC)." Dkt. 29 at 3. The Court rejected that argument because "Farber's allegations raise a question of fact as to whether WDC and the Theatrical Group operate as a single employer," and the question was more appropriate to address at summary judgment. *Id.* Defendants have now renewed this argument on summary judgment, and now that the factual record has been established, the Court agrees.

The relevant factors are: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) (quotations omitted). Defendants' challenge is based on the second factor, centralized control of labor relations. (Farber agrees that this is the central concern in the analysis.) Dkts. 54 at 25; 60 at 24. They argue that the Walt Disney Company is comprised of three subsidiaries, one of which is the parent company of the Theatrical Group, Farber's direct employer. That, they say, is a bridge too far.

Against that, Farber points to employees involved with various Disney subsidiaries who were involved with investigating Farber's complaints. He argues that the general policy for complaining about workplace discrimination is shared among the subsidiaries, evidenced in part by a shared employee handbook. But importantly, he cannot identify a single employee at the Walt Disney Company (the ultimate parent) who was involved with any of this, indicating that—if control was centralized—it wasn't centralized within the company that he's trying to sue. "In determining whether a plaintiff adequately alleges centralized control over labor relations—the most important prong in the four-part test—the central question is what entity made the final decisions regarding employment matters related to the person claiming discrimination." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 227 (2d Cir. 2014). Farber can't raise any dispute of fact as to any employee at the Walt Disney Company making *any* decision about his employment matter. Farber agrees that this is the most important factor, and it doesn't go his way.

Farber's arguments to the contrary don't lead to any other conclusion. He points to the shared employee manual and the fact that some employees use "The Walt Disney Company" in their email signatures—but neither of these shows anything like *control* of labor that would be required to hold the indirect parent company liable. Consider what courts have considered to be enough, for example when a parent "controlled [] hiring, payroll, and billing," *Senderowitz v. Hebrew Acad. for Special Child., Therapeutic Servs.*, 2026 WL 440526, at *8 (E.D.N.Y. Feb. 17, 2026).

## CONCLUSION

Though a jury may ultimately reject Farber's side of this story, the continued involvement of the very same person that he complained about with respect to his salary and ultimate termination raises triable issues. This case ultimately turns on a series of credibility determinations that are improper for the Court to make, and so some of Farber's retaliation claim will proceed.

The Clerk of Court is directed to terminate Dkt. 52. The parties are directed to meet and confer and to jointly file a letter on the docket with proposed trial dates in the fall of 2026.

SO ORDERED.

Dated: March 30, 2026
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge